**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-22236-CIV-GOLD/GOODMAN**

HOWARD ADELMAN and
JUDITY SCLAWY, as
Co-Personal Representatives of THE
ESTATE OF MICHAEL SCLAWY-ADELMEN,

      Plaintiffs,

vs.

BOY SCOUTS OF AMERICA, et al

      Defendants.

_____/

## ORDER ON PLAINTIFFS' MOTION TO COMPEL

This Cause is before the Court on Plaintiff's Motion to Compel Production from Defendant Schmidt (DE 234). The Court held oral argument on July 14, 2011. The Court reviewed the motion and response, the discovery materials at issue submitted for *in camera* review, the post-hearing memoranda and accompanying exhibits and attachments, and the pertinent portions of the record.

For the reasons outlined below, the motion is **granted in part** and **denied in part**. Defendant Schmidt is to produce all outstanding Exhibits, except Exhibit 1, within **3 days** of the entry of this order. Because an expense award is required in this situation, Schmidt's *lead counsel* shall pay the Plaintiffs **$2,000.00** within **14 days** of the entry of this order.

## I.    INTRODUCTION

"Be Prepared" is the Boy Scouts of America's motto.[1]  In this wrongful death lawsuit arising out of the death of a 17-year-old Boy Scout during a Boy Scouts' hike in a national preserve, two Scout Masters' compliance (or non-compliance) with this motto concerning sufficient preparation has become a key issue in the parties' discovery disputes.

By way of general summary, the factual issues concerning the preparation for the hike and the responses (to the decedent's signs of exhaustion and physical deterioration) of the two Boy Scout leaders who supervised the hike are vigorously contested.  The parties dispute the cause of death.  Plaintiffs claim that heat exhaustion caused the death of Michael Sclawy-Adelman and Defendants either challenge that position or decline to concede it.  The parties also dispute whether the preparation or lack of preparation by the Scouts supervisors -- individual defendants in this case -- impacted the cause of death and if their purported failure to follow the Boy Scouts' preparation-oriented motto proximately caused Michael's death.

The dispute here requires the Undersigned to analyze comparatively routine work product claims and to determine if courts are prepared to accept Schmidt's novel discovery theories.  As explained in greater detail below, Schmidt asserted boilerplate relevancy objections for all 32 emails at issue here, none of which were even remotely

---

[1]     http://usscouts.org/advance/boyscout/bsmotto.asp (last visited Aug. 19, 2011). "Be prepared for what?" someone once asked Robert Baden-Powell, the founder of Scouting. "Why, for any old thing," said Baden-Powell.

Incorporated in 1910, the Boy Scouts of America has issued more than 2 million Eagle Scout Awards and publicly announces on its website that 181 astronauts have been Scouts.  http://www.scouting.org/About/FactSheets/100_years.aspx (last visited Aug. 19, 2011).

supported by the law governing discovery.  In addition, Schmidt put forward a broad claim that other documents were off limits because of a privilege for confidential/private materials that would, if accepted, unreasonably handcuff all litigants in discovery and create the potential for discovery abuses by permitting a party resisting discovery to make unverifiable after-the-fact objections based on confidentiality.

The parties submitted dozens of pages of legal memoranda and several hundred pages of exhibits concerning the 32 emails at issue.  What should have been a **routine discovery dispute** resolved through a phone call expanded into a second, mini-litigation concerning a small handful of emails.

With the exception of one email, which is subject to a belatedly asserted work product claim, all the emails should have been produced.  Plaintiffs' counsel was therefore forced to consume a significant amount of time and incur unnecessary expenses litigating a motion to compel.  Schmidt, on the other hand, could have eliminated his exposure to Plaintiffs' expenses by agreeing to turn over the documents before the motion to compel was filed, or could have minimized his exposure by modifying his position before the hearing or before Plaintiffs submitted a 27-page memorandum of law in response to Defendant's own 25-page memorandum.  More on this later.

## II.     BACKGROUND

### A.     General Overview of Litigation

Michael Adelman died in May 2009, when he was 17 years old, while on a 20-mile hike in the Big Cypress Preserve.  Boy Scout leaders, Defendants Howard Crompton and Andrew Schmidt, were the adult supervisors on the hike.

Although an autopsy was not performed, Plaintiffs advised the Court that the medical examiner testified that heat stroke was the likely cause of death. According to Plaintiffs, the U.S. Park Service Report of Michael Adelman's death shows that temperatures in the Preserve reached 100 degrees during the early afternoon of the hike.

Plaintiffs allege that Michael began showing signs and symptoms of heat exhaustion (and, later, of heat stroke) as the hike progressed. They allege that Michael began to speak incoherently and that he stumbled and lost his balance. During a one and a half hour break at a clearing Michael became unresponsive and started to make snoring-like noises. Plaintiffs say that Defendant Crompton did not call 911 for emergency assistance until after Michael suddenly stopped breathing. By the time emergency helicopters arrived, Michael could not be resuscitated and was declared dead.

Plaintiffs, the Co-Personal Representatives of Michael's estate, brought a wrongful death lawsuit against Crompton, Schmidt, The South Florida Council Inc., the Plantation United Methodist Church, and the Boy Scouts of America ("BSA"). At an earlier hearing in this case, defense counsel for both Schmidt and Crompton argued that heat stroke may *not* have been the cause of Michael's death.

**B.      Background of Motion to Compel**

Plaintiffs served a notice of taking deposition *duces tecum* concerning Defendant Schmidt's upcoming deposition. The document schedule lists 26 categories of documents. Schmidt served a formal, written response to Plaintiffs' discovery request. (DE 234-1). This combination objection/privilege log concerns 32 emails.

The objection and purported privileges were boilerplate and were **identical** for all 32 emails: "Objection is made on the grounds of relevance, materiality, confidentiality,

and privacy.  **Privilege** is asserted on the grounds of **confidentiality** and **privacy**." (emphasis added).  No further explanation was provided and Schmidt did not interpose any other grounds for the purported privilege claim.  Schmidt did not seek a protective order, did not request entry of a confidentiality order designed to protect purportedly private matters and did not offer to redact the documents to remove private or confidential information.

After at least three unsuccessful telephone conversations designed to persuade Schmidt's counsel to change or modify his position that none of the 32 emails should be produced, Plaintiffs filed a motion to compel production of all 32 emails (DE 234).

**C.    Court Asks Schmidt to Explain His Objections**

After reviewing Plaintiffs' motion to compel, the Court entered two administrative orders (DE 235 and 237).  In the first, the Court directed Schmidt to file a response of no more than five pages and specifically pinpointed an issue for discussion: "Defendant Schmidt shall cite caselaw and other authority supporting his view . . . that certain documents would not be produced because of a purported 'privilege' for 'confidentiality and privacy.'"  In the same order, the Court also advised the parties of its practice to award attorney's fees to the prevailing party on a motion to compel unless the losing position is substantially justified.  *See* Fed. R. Civ. P. 37(a)(5).  In addition, the Court urged the parties to continue their efforts to resolve their discovery dispute without court intervention.

In the second order, the Court directed Schmidt to "cite the authority" which supports his position that all 32 emails "are not even discoverable because they are

supposedly not relevant or material."  The Court also instructed Schmidt to file the 32 emails under seal if the parties did not resolve their discovery dispute.

### D.      Schmidt's Initial Response

#### 1.      *No Authority Cited*

Schmidt filed the emails under seal for *in camera* review (DE 246) and filed a response (DE 243) to the motion to compel.  In response to the motion, Schmidt explained that some of the 32 emails were produced after Plaintiffs filed their motion to compel and after the Court entered the two administrative orders.  However, Schmidt maintained his relevancy objections and privilege claim for 22 of the 32 emails.

Despite the specific instruction that Schmidt's response should include "caselaw and other authority," his response did not cite any cases, statutes or other legal authority to support his privacy claims, such as the Florida Constitution, which contains a right to privacy.  Nor did Schmidt present evidence or advance a theory explaining how or why the persons sending or receiving these emails, which did not discuss their personal information and were not about them, had some expectation of privacy in the emails.

#### 2.      *"Work Product" Objection*

In addition, the response curiously did not actually invoke the significant and instantly recognizable phrase "work product," though it did *indirectly* (and belatedly) assert the work product doctrine by contending that four emails (Exhibits 1, 7, 8 and 9) are "privileged communications" because they are "internal communications made in anticipation of potential litigation."  The response, however, did not include any affidavits or other evidence to support Schmidt's conclusory and belated claim that that four emails were "made in anticipation of potential litigation."

3. *"Privacy" Objection*

For the most part, Schmidt's response articulated objections to production based on various "privacy" claims, untethered to any established or recognizable basis for withholding discovery.  For example, Schmidt claimed that one email (Exhibit 15) is a "private communication" sent by Schmidt to another person involved in the Boy Scouts program and that another email (Exhibit 16) is "a personal and private message" sent by Schmidt to a Boy Scouts' parent.  Schmidt contended that Exhibit 18 is a "private communication" between Schmidt and a former assistant scoutmaster whom the Defendants had since designated as an expert witness in this case.  Schmidt also contended in summary fashion that two other emails (Exhibits 19 and 20) are not relevant and therefore not discoverable, but did not in any way attempt to support his *privilege* contention for those emails.

Schmidt claimed that 10 additional emails (Exhibits 21-30) did not have to be produced because they are "expressions of personal opinions" by Troop Committee members and/or representatives of the Boy Scouts South Florida Council.  According to Schmidt, these emails (which discuss whether Michael should be posthumously awarded the Eagle Scout honor) were "made with an expectation of privacy as part of the ongoing business of the Troop."  (None of the emails are titled, stamped or otherwise branded as "privileged" or "private" or "confidential" or "not subject to disclosure".)  Schmidt argued that "the privacy rights of people communicating with him had to be respected as part of the ongoing business of the Troop Committee."

4.      *"Relevance" Objection*

Schmidt claimed that Exhibits 31 and 32 were not relevant because they "relate to an entirely different hike."  He also said there was "no predicate to make these emails **admissible at the time of trial**."  (emphasis added).  Schmidt did not press his "confidentiality"/"privacy" theory for these exhibits, even though he originally listed these grounds for non-production in his response to the request for production.

Instead, Schmidt pressed his relevancy argument and contended that the documents on the *duces tecum* schedule were beyond the scope of discovery because they (1) were "not material to the **allegations of alleged negligence** against Defendant Schmidt," (2) had "no relevance to the **allegations** against any Defendant in this case," (3) were "not relevant or material to any **allegation of negligence** by Schmidt nor to any proximate cause or any other legal theory in this case," (4) "shed [ ] no light whatsoever on whatever Defendant Schmidt **did or failed to do** which the Plaintiffs **maintain was negligent**," (5) were not "calculated to lead to admissible evidence at the time of trial **of negligence** against any Defendant," (6) did not "relate to any **allegations of negligence**, causation or the death of Michael Adelman," (7) are "not relevant to any issues in the case," (8) did not "relate to **allegations in the Complaint** made against Defendant Schmidt for negligence under even the broadest of interpretations," or (9) had "no relevance to the 20 mile hike at issue in this case." (emphases added).

E.      **Plaintiffs' Reply**

Plaintiffs replied to Schmidt's response.   (DE 244).   Plaintiffs noted that Defendants have taken the position in this litigation that Michael did not die as a result of a heat-related condition or ailment -- but that some of the emails which were produced

after they filed the motion to compel reflect a *contrary* view.  For example, Exhibit 2 says that Michael died after he "developed symptoms of heat exhaustion/stroke," while Exhibit 10 explains that Michael "succumbed to symptoms of heat exhaustion."   In Exhibit 11, Schmidt says that the proposed language in a memorandum concerning Michael -- and describing him as a scout who "succumbed to symptoms of heat exhaustion" -- looked "fine."

### F.   The Hearing

The Court held a hearing on Plaintiffs' motion to compel on July 14, 2011. Before the hearing, Schmidt produced some of the previously withheld emails.  In order to determine whether Schmidt's initial decision to withhold production was substantially justified, the Court began the hearing by questioning Schmidt's decision to withhold the belatedly produced-emails.[2]  The Court also asked Schmidt's counsel why he did not cite any case law supporting his "privacy/confidentiality" objection, even though he was instructed to do so.

Addressing the form of Schmidt's initial objections, Schmidt's lead counsel advised the Court that although he did not personally prepared the privilege log, he reviewed the emails and he determined which ones to withhold and to list on the privilege log and took full responsibility for the initial objections.

---

[2]   Rule 37(a)(5) provides for the mandatory award of reasonable expenses, including attorney's fees, with limited exceptions, when a motion to compel is granted "or if the disclosure or requested discovery is **provided after the motion was filed**." (emphasis added).

Turning to the substance of the objections, Schmidt made two basic arguments: relevance (or, to be more accurate, the purported *lack* of relevance for discovery purposes) and a privilege (for "confidentiality" and/or "privacy").

For example, Schmidt argued that he withheld Exhibit 2, a May 10, 2009 email from Schmidt to more than two dozen recipients, because it involved non-parties whose privacy rights needed to be respected.  (Michael died on May 9, 2009, so the email in question was sent the day after his death.)  Schmidt also argued that the email was not relevant and was beyond the scope of permissible discovery.  The email said that Michael Sclawy-Adelman died during a Scout hike after he "developed symptoms of heat exhaustion/stroke."  The cause of Michael's death is an issue in this lawsuit and, as noted above, Defendants dispute that heat stroke or exhaustion was a cause of death.  Nevertheless, Schmidt's counsel maintained his objection that the email was not relevant.

Schmidt's counsel also maintained his argument that the email was not discoverable and was privileged because of "the families who are involved in the troop [were] recipients of this email."  (DE 258, Tr. 13).  Upon further questioning, counsel conceded that he did not have any legal authority to support his position and had not cited any in his response to the motion to compel.  Moreover, he did not suggest that the names of the recipients be redacted so that the *substance* of the email could be produced without compromising the families' apparent preference to remain anonymous.

At one point, Schmidt's counsel said that he felt "constrained" by the five-page limit given by the Court for his response memorandum.  The Court therefore *offered* Schmidt the opportunity to submit a post-hearing memorandum without any page limit and Schmidt accepted the offer.   Schmidt's counsel agreed that this supplemental

memorandum would discuss, among other issues, his argument that "there is some sort of privacy right caused or **triggered by the mere presence of the parents upon the e-mail stream**." (Tr. 15-16) (emphasis added). Later in the hearing, the Court suggested to defense counsel that his post-hearing memorandum cite specific cases to "support the notion that the phrase, 'right to privacy,' in the Florida Constitution, would somehow immunize some or all of these documents from discovery." The Court expressed concern that Schmidt's discovery position "could be used in every single case, no matter what the case, to authorize the withholding of all documents, because somebody could say, 'I have a right to privacy.'" (Tr. 38-39).

Schmidt's counsel conceded at the hearing that he did not in any way assert work product on the privilege log or in the discussions and written communications he had with Plaintiffs' counsel before the motion to compel was filed but advised that he was now asserting it as to 4 of the remaining emails: Exhibits 1, 7, 8 and 9. Finally, the South Florida Council made an *ore tenus* request to submit a memorandum to support Schmidt's work product claim, which the Court granted.

### G.    Post-Hearing Submissions

Schmidt filed a 26-page post-hearing memorandum (DE 259), an affidavit concerning his understanding of the confidential nature of some of the emails (DE 264-1), and a copy of his deposition transcript (DE 262 and 263). Schmidt explained in his affidavit that several emails were "private and confidential" and that he "expected" that they would remain private as between himself and the other party. For those emails which were copied to others or which were addressed to more than one recipient (e.g. Exhibits 16, 21, 22), Schmidt explained that he expected the emails not to be shared with

others.  For some of the emails between Schmidt and one other person (e.g., Exhibits 9, 21, 23, 24, 25, 26, 27, 28), Schmidt explained that he "believes" the other person expected him to keep the email confidential.  None of the emails covered by Schmidt's post-hearing affidavit are marked confidential, sensitive, private, or not subject to disclosure, however.

The Council submitted a post-hearing memorandum, which included its own, separate, previously submitted amended privilege log, deposition excerpts and affidavits. (DE 256 and 256-1 through 256-5).  The Council's submission concerned the work product claim for four of the mails, but it did not seek to support Schmidt's other objections.  Plaintiffs also filed a lengthy post-hearing memorandum.

### III.    LEGAL STANDARD

#### A.    Objections to Discovery

Local Rule 26.1(g)(3)(A) requires that an objection to a document request "state with specificity all grounds" for the objection.  It also imposes consequences for failing to comply: "any ground not stated in an objection . . . **shall** be waived."  (emphasis added).

In the Eleventh Circuit, objections to discovery must be "plain enough and specific enough so that the court can understand in what way the [discovery is] alleged to be objectionable." *Panola Land Buyers Assoc. v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985).  *Panola* cited to *Josephs v. Harris Corp.* 677 F.2d 985, 992 (3d Cir. 1982), where the Third Circuit held that the party resisting discovery "must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome, or oppressive."

Bottomed on this overarching philosophy, judges in this district typically condemn boilerplate objections as legally inadequate or "meaningless." *See e.g., Guzman v. Irmadan, Inc.,* 249 F.R.D. 399, 401 (S.D. Fla. 2008); *Milinazzo v. State Farm Ins. Co.,* 247 F.R.D. 691 (S.D. Fla. 2007). *See generally Benefatto v. Wachovia Bank N.A.*, No. 08-60646, 2008 WL 4938418 (S.D. Fla. Nov. 19, 2008) (generalized objections are not recognized by this Court).

**B.     Scope of Discovery**

It is well established that the Federal Rules of Civil Procedure "strongly favor full discovery whenever possible." *Farnsworth v. Procter & Gamble Co*., 758 F.2d 1545, 1547 (11th Cir. 1985). Rule 26(b) therefore permits a party to obtain discovery of "any matter, not privileged, that is relevant to the claim or defense of any party." "The Courts have long held that **relevance for discovery purposes** is **much broader** than relevance for **trial** purposes," and as such "[d]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has **no possible bearing** on the subject matter of the action." *Dunkin'Donuts, Inc. v. Mary's Donuts, Inc.*, No. 01-0392, 2001 WL 34079319, *2 (S.D. Fla. Nov. 1, 2001) (emphases added).

The Supreme Court has held that the term "relevant" in Rule 26 should encompass "**any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case**." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (emphasis added). In discussing the broad construction of the relevancy component of Rule 26, *Oppenheimer Fund* noted that "the court should and ordinarily does interpret 'relevant' very broadly to mean matter that is

or may became an issue in the litigation." *Id.* at 351 n.12 (citing 4. J. Moore, Federal Practice § 26.56 [1], p. 26-131 n. 34 (2d ed. 1976)).

United States Magistrate Judge Linnea Johnson summarized the rules underlying the broad scope of discovery in *Donahay v. Palm Beach Tours & Transportation, Inc.*, 242 F.R.D. 685, 687 (S.D. Fla. 2007):

> Information is relevant if it is "germane, conceivably helpful to plaintiff, or reasonably calculated to lead to admissible evidence." Thus, as explained by the *Oppenheimer Fund* Court, relevant discovery under Rule 26 is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues." In short, information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. (citations omitted).

As the party resisting discovery, Schmidt has the burden to demonstrate specifically how the request is unreasonable or not relevant. *See generally Desrosiers v. MAG Industrial Automation Systems, LLC*, 675 F. Supp.2d 598, 602 (D. Md. 2009) (distinguishing between burdens of a party *resisting discovery* -- who must specifically explain why the relevancy objection is proper and why the discovery is improper -- and party *offering evidence at trial* -- who bears the burden of demonstrating that evidence is relevant and admissible). Therefore, discovery is not "limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Oppenheimer Fund*, 437 U.S. at 352.

Given Schmidt's position that many of the 32 emails are not within the scope of discovery because they are not relevant to the negligence *allegations* which Plaintiffs asserted in their complaint, it is worth noting that Rule 26(b) ("Discovery Scope and Limits") provides that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim **or defense**." (emphasis added). The Official

Committee Notes to the 2000 Amendment of the rule explain that "a variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action."  One illustration of a subject encompassed by the scope of discovery, even though not directly linked to a claim or defense, is "information that could be used to impeach a likely witness."

### C.    Work Product Protection

Schmidt belatedly asserted a work product claim for four of the 32 emails.

Work product protection operates to "remov[e] counsel's fears that his thoughts and information will be invaded by his adversary."  *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978).  The proponent of the privilege has the burden of proving its applicability.  *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996).

Rule 26(b)(3) provides specific protection for work product:

(A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) . . .

(B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning litigation.

Even if the proponent meets the burden by demonstrating when and why a document was created, once a party asserting privilege makes disclosures of privileged information to third parties, the communications are no longer confidential.  *See United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) (justification for privilege ceases once disclosed to third parties); *Stern v. O'Quinn*, 253 F.R.D. 663, 682-83 (S.D. Fla.

15

2008) (work product waived because the disclosures to third parties were neither involuntary nor compelled).

Finally, a document or report need not be a finished product to achieve work product status.  When all the other elements of the privilege are met, draft materials may properly be considered work product.  *See Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 608 (D. Nev. 2005); *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 125 F.R.D. 578, 591 (N.D.N.Y 1989)

## IV.  ANALYSIS

### "Before You Accuse Me, Take a Look at Yourself"[3]

#### A.     No Procedural Waivers

In his post-hearing memorandum opposing the motion to compel, Schmidt argued for the first time that Plaintiffs' motion is untimely and should be denied because it was filed in violation of Local Rule 26.1(h)(1), which requires discovery motions, including motions to compel, to be filed within thirty (30) days of the occurrence of grounds for the motion.  Specifically, Schmidt notes that the privilege log was served on March 7, 2011

---

[3]     This lyric is from the well-known rock and roll/blues song "Before You Accuse Me," written and originally recorded by iconic rock/blues pioneer Bo Diddley in 1957. http:www.sonfacts.com/detail.php?id=1334 (last visited Aug. 19, 2011).  Born Otha Elias Bates in McComb, Miss., a small city approximately 15 miles from the Louisiana border, Bo Diddley's name was changed to Elias B. McDaniel.  He was inducted into the Rock and Roll Hall of Fame in 1987 and in 1998 was inducted into the National Academy of Recording Arts and Sciences Hall of Fame as a musician of lasting historical importance. http://www.nytimes.com/2008/06/03/arts/music/03diddley.html  (last visited Aug. 18, 2011).

Famed guitarist Eric Clapton recorded "Before You Accuse Me" as the B-side of "Bad Love," the first single from Journeyman.  The song has been covered by several musicians, including Creedence Clearwater Revival, which recorded it on its "Cosmo's Factory" album.  http:www.songfacts.com/detail.php?id=1334  (last visited Aug. 19, 2011).

but that Plaintiffs did not file their motion to compel until June 24, 2011. Therefore, according to Schmidt, the motion is late and should be denied on that ground alone.

Schmidt did not raise this timeliness argument in his initial response to the motion to compel or at the July 14, 2011 hearing. Instead, the first suggestion of the allegedly untimely nature of the motion to compel was in Schmidt's *post*-hearing memorandum.

Therefore, Schmidt is *himself* raising an untimely objection to Plaintiffs' supposedly untimely motion to compel and is guilty of the very procedural sin he is accusing Plaintiffs of committing here. Given that the Court spent considerable time reviewing the motion and memoranda and under-seal exhibits and held a hearing, Schmidt himself waived his right to assert this waiver argument.

The 1998 Comments to Local Rule 26.1 note that the 30-day provision is designed to ensure that discovery motions are "filed when ripe and not held until shortly before the close of discovery or the eve of trial." There is no evidence here to suggest that Plaintiffs purposefully held the motion and waited to spring it on Schmidt until shortly before trial. Additionally, Plaintiffs say that they took the privilege log at face value and did not realize until a May 26, 2011 deposition that "for the first time that there was something wrong with the Privilege Log." Using that date, the motion to compel would be timely.

Also, the Local Rule's provision that an untimely discovery motion can be denied is *permissive,* not mandatory, which is another reason to reject Defendants' Local Rule-based waiver argument. Moreover, the Local Rule provides a safety valve where there is "reasonable cause for a later filing." Plaintiffs note that they spent time negotiating with

Schmidt's counsel and were surprised to learn about the issue in the first place and say that this constitutes reasonable cause.

Under these circumstances, the Court will consider the merits of the motion to compel and will not construe the multi-month gap between Defendants' service of the privilege log and Plaintiffs' filing of the motion to compel as a waiver.[4]

**B.    Work Product**

Schmidt now takes the position that four emails (Exhibits 1, 7, 8 and 9) are protected work product materials.  He did not assert work product as a ground for non-production in his privilege log but first articulated this theory in his response to the motion to compel and even then did not actually use the term "work product."

The South Florida Council joins in this argument and submitted an affidavit from Joshua Christ, Director of Field Services for the South Florida Council.  In the affidavit, Christ explains that he is familiar with the Boy Scouts of America's incident reporting policies for death or serious injury.

According to the affidavit, the Council follows the BSA's incident reporting policies.  The BSA's risk management policy requires reports on incidents involving deaths or serious injuries and requires an adult member to inform the Council's Scout Executive, who then prepares a "Preliminary Report of Fatal or Serious Injury or Illness" and forwards it to the Health and Safety Director at BSA's headquarters.  Christ says that

---

[4]     However, the Court's willingness to consider the motion does not mean the Plaintiffs are completely without fault.  Given the 30-day deadline in the local rule and the three-month gap, Plaintiffs should have flagged the issue in clear terms and explained in their motion to compel why the motion to compel was still timely. What they should not have done is simply ignored the issue and referred to it obliquely and cryptically and hope that no one noticed.

Schmidt followed these procedures by informing Jeff Hunt, the Scout Executive for the South Florida Council, of Michael's death during the Scout hike.

Exhibit 1, a May 10, 2009 email from Schmidt, is entitled "Troop 111 Incident." Schmidt sent it to a Ms. Hungler, with a note to forward it to Jeff Hunt "ASAP." Schmidt's email begins with the comment that its purpose is to "inform the Council" about Michael's death.  This is a protected work product document.  *See Fojtasek v. NCL (Bahamas) LTD*, 262 F.R.D. 650, 656 (S.D. Fla. 2009) (protecting as work product, in a lawsuit against a cruise line, an incident report prepared the day after the incident even though it was prepared by a zip-line tour operator who advertised excursions in a book which the cruise company distributed to passengers); *Alexander v. Carnival Corp.,* 238 F.R.D. 318 (S.D. Fla. 2006) (holding that accident reports of slip and fall incidents concerning food on the teak portion of the pool decks of cruise ships are work product because defendant established a policy of preparing reports of incidents resulting in injury so that they can be forwarded to counsel in the event of litigation).

Plaintiffs argue that this email cannot be work product because it is not on the official reporting form used in connection with the BSA's reporting system.  But Plaintiffs have not called our attention to specific law which holds that a work product document must necessarily always be on a specific form.  If that were the case, then only *final* reports on the actual reporting form would be protected by work product -- and all memoranda and notes used to prepare the final version of the report would *not* be covered by the work product privilege.  The Court rejects this argument as unpersuasive, illogical and inconsistent with the fundamental principles underlying the protection.  *See also Ideal Elec.*, 230 F.R.D. at 608; *Niagara Mohawk* Power, 125 F.R.D. at 591.

**Exhibits 7, 8 and 9** are May 11, 2009 emails which began with a Schmidt-created email mentioning that Jeff Hunt asked him certain questions about the hike in which Michael died.  Although *two* of these three emails were not sent directly to the Council, they both relate to questions posed by the Scout Executive charged with the task of preparing a preliminary report for risk management purposes.  These emails would be protected work product -- *if* they had not purposefully been circulated to third parties (which they were).

All of these three emails were also sent to or were from Cliff Friewald.  However, no defendant has provided information about Cliff Friewald.  Both Schmidt and the Council knew that Friewald's presence on the emails would be an issue for the work product analysis, as it was discussed at the hearing.  Specifically, Schmidt's counsel was not sure about Friewald's status and asked the Council's attorney for assistance.  The Council's attorney advised that he had "no knowledge" of whether Friewald is "simply an adult leader or whether he is on the South Florida Council." I don't know."  (Tr. 36).

In addition, Exhibit 7 was sent to Dean Kubler, who is the parent of a former Scout and a former Assistant Scout Master for Troop 111.  Kubler is therefore a *lay* witness.  Neither Schmidt nor the Council have offered evidence to suggest that Kubler has an official position with either the Boy Scouts of America or the Council and there is nothing to indicate that Kubler played a role in the risk management protocol surrounding the incident reporting.

Because third parties are included in the email chains of **Exhibits 7, 8 and 9,** and because Defendants have not provided any evidence about their roles, if any, in the report preparation protocol for risk management purposes, they have not met their burden of

establishing that the emails are covered by the work product privilege for these documents.

### C.    "Privacy" / "Confidentiality" Privilege

#### 1.    *No General Confidentiality Privilege Under Federal Law*

It is "well settled that there is no absolute privilege for trade secrets or other confidential information."  8A Wright & Miller, Fed. Prac. & Proc. Civ. § 2043 (3d ed.); *see also I.S.E.L., Inc. v. American Synthol, Inc.* No. 08-870, 2009 WL 3367237, at *2 (M.D. Fla. Oct. 15, 2009) ("there is no absolute privilege that immunizes trade secrets and similar confidential information from discovery").

Also relevant here, discovery is often required even though it concerns third parties not named in the lawsuit.  *Riccheti v. Starfish Beach South, S.A.,* No 10-21754, 2010 WL 5437259, (S.D. Fla. Dec. 27, 2010) (rejecting argument that records are "confidential" because they relate to third parties and distinguishing between privileged and "confidential" information).  Although parties and non-litigants, such as the parents of other scouts involved in the hike or part of the troop, may prefer anonymity, "the understandable desire for privacy must give way to [a litigating party's] rights to discovery."  *Hubbard v. Bankatlantic Bancorp, Inc.* No. 07-61542, 2009 WL 3856458, at *5 (S.D. Fla. Nov. 17, 2009) (granting motion to compel and requiring production of discovery disclosing the identities of "confidential witnesses").[5]

---

[5]    The Southern District of Florida is not unique in its approach toward discovery and its view that purportedly "confidential" documents are not immune from discovery. *See e.g., Directv, Inc v. Puccinelli*, 224 F.R.D. 677, 684-85 (D. Kan. 2004) ("a general concern for protecting confidentiality does not equate to privilege" which means that "information and documents are not shielded from discovery merely because they are confidential"); *Hanas v. Inner City Christian Outreach Center, Inc.,* Case No. 06-CV-10290, 2007 WL 551609, at *2 (E.D. Mich. Feb. 20, 2007) ("although this is

The Court observes that the emails subject to Schmidt's "privilege" of "confidentiality" objection (1) do not have a warning or notice attesting to the supposedly personal nature of the communications, (2) do not say they are personal or private or confidential, and (3) although some of the emails express opinions, there is nothing *unusually* personal or private about the opinions and there is nothing which would be expected to cause Schmidt or others in the email chain to be embarrassed.  Additionally, Schmidt does not say in his affidavit that he and his email communicators ever *discussed at the time* the notion of privacy -- he merely says, after the fact, that this was the understanding or expectation, and Schmidt's affidavit says that he *believes* that certain email sender or recipients expected him to keep the email confidential but does not explain *why* he believes this.

If the emails which Schmidt says should not be produced (merely because he expected them to remain private) were deemed off limits in this case, then it would be difficult to imagine a case where similar concerns could not be raised to frustrate discovery.  Indeed, under Schmidt's theory, every person who sent an email or a letter could ensure that it never would be produced in discovery by simply stamping "personal" or "confidential" on it.  Moreover, given that *Schmidt's* emails did not contain such an express designation, any person served with a subpoena *duces tecum* or a request for production could obtain a ruling foreclosing discovery simply by saying, after the fact, that the sender or recipient intended the communication to be private and confidential.

---

understandable, privacy or the need for confidentiality is not a recognized basis for withholding discovery"); *Sonnino, M.D. v. University of Kansas Hospital Authority*, 220 F.R.D. 633, 642 (D. Kan. 2004) ("It is well settled that a concern for protecting confidentiality does not equate to privilege, and that information and documents are not shielded from discovery on the sole basis that [] they are confidential").

Under Schmidt's expansive theory of confidentiality and its logical outgrowths, there would be no need for any other privilege concerning documents, such as the attorney-client privilege or the accountant-client privilege, because persons receiving discovery requests could obtain the same relief simply by simply marking a document or email as private or confidential. Following Schmidt's theory into other discovery contexts, notions of confidentiality could also be used to foreclose deposition questions about *conversations* relevant to the claims, defenses or other discoverable matters. Carried to its logical conclusion, there would be precious little which could not be branded as off limits under a doctrine which recognized as binding an agreement or understanding that conversations and documents remain confidential.

The Court is not aware of *any* legal authority to support such a sweeping view of confidentiality. And although Schmidt does not expressly articulate the illustrations provided here for discussion purposes, there is no logical way to short-circuit Schmidt's theory about confidential emails in this case from having the consequences mentioned in the hypotheticals.

What is more, these hypothetical consequences assume that the persons involved in the communications actually agreed *at the time* to mutually treat the discourse as confidential. The consequences would be even more sweeping if there were no contemporaneous agreement to maintain confidentiality but those served with discovery requests later *claimed* that there was such an understanding. Thus, the theory implicit in Schmidt's confidentiality argument could easily be manipulated by those willing to make false, after-the-fact claims about oral confidentiality agreements or understandings.

At bottom, Schmidt's discovery philosophy about confidentiality is overly broad and nebulous, would unduly hamper legitimate discovery, would be difficult to assess in practice and could be easily manipulated.

The Court declines to adopt such a theory, especially when Schmidt has not supported it with any applicable legal authority.[6]

2.      *Inapplicability of Florida's Constitutional Right to Privacy*

Schmidt did not mention Florida's Constitutional Right to Privacy in his written objections to the production request, nor in his response to the motion to compel.  He asserted it for the first time at the hearing and does so again in his post-hearing 26-page memorandum.[7]

Article I, Section 23 of Florida's Constitution expressly provides for a right of privacy: "Every natural person has the right to be left alone and free from governmental intrusion into his private life except as otherwise provided herein. This Section shall not be construed to limit the public's right of access to public records and meetings as provided by law."  This constitutional provision, however, does not eliminate otherwise

---

[6]      The United States Supreme Court has noted that it does "not in principle oppose the "parade of horribles" form of argumentation." *Harmelin v. Michigan,* 501 U.S. 957, 987, n.11 (1991).  The phrase "parade of horribles" is typically used to "denigrate the majority's or the dissent's contention that the principle embraced by the other side will produce certain specified undesirable consequences . . . [and] those consequences are dismissed, with a wave of the hand, as 'the familiar parade of horrible.'"  Antonin Scalia, *Assorted Canards of Contemporary Legal Analysis*, 40 Case. W. Res. L. Rev. 581, 590 (1989 - 1990).  But Justice Scalia, for one, has advised to "not scoff at the 'parade of horribles' in principle, as though the marchers in fact never materialize." *Id.* at 592.

[7]      Under Local Rule 26.1(g)(3)(A), the Court could easily treat the objection as waived.  However, because Schmidt *mentioned* the word "privacy" in his written objection, the Court will take an expansive view of his objection and, given the mini-litigation that this dispute has already spawned, consider the argument on its merits.

applicable discovery rules and does not, absent special or unique circumstances, prevent routine discovery from parties involved in litigation.

### i.      *Schmidt Cannot Assert Rights of Third Parties*

Before discussing the contours of this right to privacy, it is appropriate to note that Schmidt is, in large part, seeking to protect the privacy of *others*.  In particular, he objects to producing certain emails because he says the privacy rights of third persons who sent, received or were copied on the emails need to be respected and protected.

Nevertheless, "even where a constitutional right to privacy is implicated, that right is a personal one, inuring solely to individuals."  *Alterra Healthcare Corp. v. Estate of Shelley*, 827 So. 2d 936, 941 (Fla. 2002).  In *Alterra*, the Florida Supreme Court held that an assisted living facility lacked standing to deny a discovery request by asserting the constitutionally based privacy rights of its employees.  The court observed that a litigant must ordinarily assert "his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."  *Id.*  Significantly, the Florida Supreme Court explained that the enactment of Section 23 "ensures that individuals are able to determine for themselves when, how and to what extent **information about *them*** is communicated to others."  *Id.*  (emphasis added).

Notably, the other Boy Scouts parents whose privacy interests Defendants say they are protecting have not intervened in the case to advance their privacy interests, nor have they otherwise challenged the potential disclosure of emails containing their names and email addresses.  Thus, those who should be the most concerned about the emails under Schmidt's discovery-privacy theory seem completely uninterested in whether the emails are produced.

Therefore, under the traditional rules of *jus tertii* jurisprudence, a party like Schmidt lacks standing to object to discovery because of the privacy rights of non-party parents of other Boy Scouts or of other Boy Scout supervisors or officials.[8]

### ii.   *Florida's Constitutional Right to Privacy is Limited to Highly Sensitive Information*

Given that the focus of the constitutional privacy protection is to provide individuals with the ability to limit distribution of sensitive information *about* them, it is hardly surprising that the cases which enforce this right concern information of the most sensitive and personal nature: records of blood donors,[9] the identities of other alleged victims of sexual abuse,[10] the identities of alleged shoplifters,[11] the names and addresses of patients at a psychiatric hospital,[12] and the names, addresses and telephone numbers of 300 patients of a medical office.[13]

---

[8]     Schmidt argues that the discovery propounded by Plaintiffs is improper because it undermines the privacy interests of Boy Scout parents and other third parties on the email chain.   But Schmidt has *himself* propounded discovery seeking the same type of information.   In particular, Schmidt recently propounded a request for production for, *inter alia*, all emails, writings and notes sent or received by Michael Adelman, his parents, anyone in the Troop, scout masters, a church, the Boy Scouts of America and the South Florida Council, regarding "the incident described in Plaintiffs' Amended Complaint" or "Michael Adelman's passing," It also asks for all documents concerning "sympathy cards."   (DE 275-6).   Apparently, Schmidt (or his counsel) believes it is improper for Plaintiffs to ask him to produce documents mentioning third parties but perfectly acceptable for him to ask Plaintiffs for these types of documents.   This inconsistent and inequitable approach is yet another consideration militating against Schmidt's position.

[9]     *Rasmussen v. South Florida Blood Service, Inc.*, 500 So. 2d 533 (Fla. 1987) (preventing Plaintiff from discovering the identity of voluntary blood donors).

[10]     *Favalora v. Sidaway*, 996 So. 2d 895 (Fla. 4th DCA 2008).

[11]     *Publix Supermarkets, Inc. v. Johnson*, 959 So. 2d 1274 (Fla. 4th DCA 2007).

[12]     *Community Psychiatric Centers of Florida, Inc., v. Bevelacqua*, 673 So. 2d 948 (Fla. 4th DCA 1996).

But even when a discovery request seeks comparatively personal and private information for non-litigant third parties, the discovery is still often *allowed,* notwithstanding the right to privacy in Section 23 of the Florida Constitution, if safeguards are implemented.  For example, in *Amente v. Newman*, 653 So. 2d 1030 (Fla. 1995), a patient in a medical malpractice case requested medical records for all of the doctor's *other* markedly obese obstetric patients during a two-year period.  The plaintiff there specifically asked that the patient-identifying information be redacted.  The trial court permitted the discovery but the appellate court granted a writ of common law certiorari because, *inter alia*, the discovery order violated the patient's constitutional right to privacy.  But after finding the medical records relevant, the Florida Supreme Court held that the patients' constitutional privacy rights were not violated because the redactions provided sufficient protection.[14]

### 3.   *Additional Analysis of Privacy Claims*

The emails at issue here are not the type that generate any legitimate concern about protecting and balancing the rights of non-litigants, such as the parents of other scouts in the troop.  The information in the emails is not **about** them.  The mere fact that a parent of another Boy Scout receives an email on the issue of whether Michael should receive the Eagle Scout award is hardly the type of issue which places the *parents'* privacy interests or desire for confidentiality at stake.

---

[13]    *Colonial Medical Specialties of South Florida, Inc. v. United Diagnostic,* 674 So. 2d 923 (Fla. 4th DCA 1996).

[14]    In contrast, Schmidt did not offer to redact the names and email addresses of the non-litigant parties listed on the emails.

Concerning Schmidt's arguments that certain parents of other Scouts need to have their privacy interests protected, justifying his refusal to produce relevant emails, "litigants may not shield otherwise discoverable information from disclosure to others merely by agreeing to maintain its confidentiality." *Directv,* 244 F.R.D. at 685.  In the instant case, of course, Schmidt has not proffered, let alone submitted, any evidence to establish that the parents actually entered into some type of confidentiality agreement before sending and receiving emails.  Of course, that type of agreement would not have shielded the emails from discovery even if it had been entered into at the time.  Instead, the circumstances here suggest that Schmidt, through counsel, has simply made the *argument* that the parents expected some sort of privacy protection concerning the emails.  But that argument is not persuasive, because (among other reasons) it would severely undermine the well-established scope of discovery.

Schmidt argues that the "right to privacy" in Florida's Constitution applies to take the emails off of the discovery table.  But that right does not protect the information in the disputed emails, comparatively mundane, routine, unremarkable communications of basic information. There is a world of difference between a discovery request for sensitive information **about** a third party, such as a non-litigant's medical records, blood test results or psychological reports, and a discovery request for information which is not about the third party, such as these emails discussing whether a Boy Scout should receive an award (and the third party is merely *copied* on the email).  *See Miller v. Savanna Maintenance Assoc.*, 979 So. 2d 1235, 1238 (Fla. 4th DCA 2008) (permitting discovery of information about non-litigants and noting that a discovery request for the names of a

homeowner association's residents and the names and addresses of their relatives "contains no damaging or sensitive information, as would medical records").

Moreover, even if a valid confidentiality objection could be made in this instance, at the very most it would justify *redacting* the "confidential" names and email addresses from the emails on which they appear.   It would not support a complete refusal to produce the substance of all the emails.   In any event, providing the names and addresses of third parties is a routine, commonly-accepted method of discovery.   In fact, it is so accepted that the very first interrogatory listed in the sample interrogatories in Appendix B ("Standard Form Interrogatories") to the Discovery Practices Handbook contains the following information request: "Please provide the name, address, telephone number, place of employment and job title of any person who has, claims to have or whom you believe may have knowledge or information pertaining to any fact alleged in the pleadings . . . filed in this action, or any fact underlying the subject matter of this action."[15]

Not only does this form interrogatory call for the very type of information which Schmidt says is confidential and private -- the names and addresses of non-litigant third parties -- but it authorizes the disclosure of far *more* personal and invasive information: their place of employment and job title.   Moreover, it approves of discovery requests for

---

[15]   Administrative Order 96-36 adopts the Discovery Practices Handbook as an appendix to the Local Rules for the Southern District of Florida.   It explains that the practices in the handbook "may be looked to by practitioners for guidance in conducting discovery in this district."

the disclosure of actual addresses, which may well be more personal and private than the email addresses which Schmidt says must be exempt from discovery.[16]

Schmidt's argument is further undermined by his inconsistent approach to production. He produced before the hearing emails which contained the names and addresses of non-litigant third parties -- the very persons whose privacy interests he says he needs to protect by not producing the still-withheld emails. For example, he produced Exhibit 2, an email listing the names and email addresses of more than a dozen other Boy Scouts parents (and others) who are not parties to this lawsuit. Therefore, Schmidt has *already* produced some emails with the names and emails addresses of other Boy Scouts parents and he has not explained why that information is worthy of *less* protection than the parents on the not-yet-produced emails. These positions are fundamentally at odds with each other, especially given Schmidt's position, at the hearing, that he would not voluntarily turn over privileged material.

### D.      Personal Opinions Objection

Schmidt also argues that the emails should not be produced because they contain personal opinions. There is no opinion exemption to the discovery rules and Schmidt has not called our attention to any such exemption in his objection, initial response memo or 26-page post-hearing memorandum. Rule 26(b)(3)(B) provides that courts which order discovery of *work product materials* must "protect against disclosure of the mental

---

[16]      The Standard Interrogatories in the appendix to the *Florida* Rules of Civil Procedure expressly suggest similar interrogatories. For example, Interrogatory 10 in Form 2 ("general personal injury negligence – interrogatories to defendant") specifically authorizes an interrogatory asking for the "names and addresses" of all fact witnesses and a specific summary of the subject matter of their knowledge. This Court is not bound by the standard, approved interrogatories in state court litigation, but their existence is powerful evidence of the widespread acceptance of these types of inquiries in discovery.

impressions, conclusions, opinions or legal theories of a party's attorney or legal representative concerning the litigation." But this does not create a new privilege or discovery immunity for otherwise discoverable information merely because a non-lawyer (such as a Boy Scout parent or supervisor) happens to express an opinion in a document.

If there were such a discovery exemption for personal opinions, as urged by Schmidt, then all letters, emails, memoranda, notes and other documents encompassed by a discovery request would have to be scoured for phrases such as "in my opinion," "I believe," "in my view" and "I think," so that they could be placed in the "do-not-produce" group of materials. No statute, rule, regulation, case or other authority which the Court is familiar with authorizes this type of discovery immunity.

### E. Relevancy Objections

#### 1. *Boilerplate Objections*

As with the rest of his objections, Schmidt's relevancy objection is boilerplate, repeated verbatim for all 32 emails with no further detail and violates both the Local Rule and this district's discovery objections law. Although Plaintiffs noted the boilerplate nature of Schmidt's objections, they did not moved to compel based on a wavier theory but instead argued that the emails should be produced because they are relevant. While the Court *could* grant the motion to compel solely based on Schmidt's procedurally inadequate objections, it will nevertheless address the merits.

#### 2. *All the E-Mails are Relevant*

In sum, Schmidt's relevancy arguments run counter to basic principles of discovery practice and are not well-taken. The scope of discovery is not circumscribed by the specific allegations or claims in the complaint. It is far broader, and covers

documents and information concerning claims, defenses and a smorgasbord of factual issues including the identity of witnesses, bias, credibility, potential impeachment and (specific to this case) notice of potential safeguards before embarking on a hike.

The "overall purpose" of discovery is to "require the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts and, therefore, embody a fair a just result." *I.S.E.L.*, 2009 WL 3367237, at * 2 (*citing United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958))

But Schmidt argues that an email sent the day after the hike in which Michael died, which discusses heat stroke and exhaustion, is irrelevant for discovery purposes. This is an incredible position given that Defendants challenge the cause of death. To put it diplomatically, Schmidt's position is not substantially justified. But he nevertheless maintained it at the hearing and did not rescind the objection. The rationale underlying this argument is difficult to understand. [17]

Schmidt also appears to have blurred the line between relevancy and privilege. Although the Court sustains the work product claim for a single email (Exhibit 1), the mere fact that this document is work product hardly means that it is *irrelevant*. Exhibit 1 was sent the day after Michael's death. The Court will not describe its contents, as it is a work product email. But, suffice it to say, the email provides considerable detail about the particular circumstances surrounding Michael's death on the hike. It is surely

---

[17]     At the hearing, Schmidt's counsel argued that the email (Exhibit 2) is not "relevant to the allegations of what happened in the Everglades leading up to the hike or their allegations of what they allege Andy Schmidt did that proximately caused Michael Adelman's death." (Tr. 10).

*relevant*.  Thus, this exhibit will not be produced -- but not on the fundamentally illogical ground that it is not relevant, but rather because it is subject to work product protection.

Schmidt asserted the "relevancy" objection for all 32 emails, including those which he belatedly turned over before the hearing.  But he has not explained why the documents he turned over are any *less* irrelevant than the emails he continues to withhold, and the Court cannot discern a significant distinction either.  This anomaly is yet another reason why Schmidt's relevancy objection is unpersuasive.

3.    *Relevance of the Belatedly Produced Documents*

Because some of the 32 emails discuss the cause of death (or Schmidt's comments about the cause of death or the comments of others about heat exhaustion) and because one or more of the Defendants challenges Plaintiffs' position that heat exhaustion/heat stroke is the responsible factor, documents mentioning heat exhaustion (such as Exhibit 2) are certainly relevant and fall well within the permissible ambit of civil discovery.  As previously discussed, there is also no "privilege" which would justify the non-production of any of these emails.

Likewise, an email which discusses the funeral arrangements (Exhibit 6) and which also explains that news reports of Michael's death contained inaccuracies, such as the statement that "there was NO water on or near the trail," is also easily within the broad scope of discovery.

Exhibit 10 (an email sent to Schmidt two days after Michael's death) discusses a proposed email to the "Pine Island District Family" and mentions that Michael "succumbed to symptoms of heat exhaustion."  This is relevant and discoverable.

Exhibit 11, a May 11, 2009 email from Schmidt to a Scout district executive, approving the draft email (i.e., "looks fine") is also relevant.

Exhibit 13, a May 11, 2009 email from Schmidt, summarizing Michael's "Scout record," is also relevant.

Exhibit 14, a May 11, 2009 email from Schmidt to other Scout leaders which mentions that Michael's parents "have denied the autopsy request by the sheriff's office," is obviously relevant.

Exhibit 3, a May 10, 2009 email to Schmidt which discusses the inevitable media coverage and advises Schmidt to "not speak to any reporters," is likewise relevant and discoverable.

Exhibit 17, a May 12, 2009 email from Schmidt, thanking others involved with the Troop for their support, is not objectionable in any way.

4.      *Relevance of Documents Still Being Withheld*

Four of the emails are still being withheld (Exhibits 1, 7, 8 and 9) subject to a belated work product claim, which the Court has already addressed.   The remaining documents are being withheld on a "confidentiality" or "privacy" objection, which the Court rejects, or based on relevance objections, which the Court will now address.

Exhibit 15 is a May 12, 2009 email from Schmidt to another Boy Scout leader.  It discusses the upcoming funeral, the news media, predicted attendance and calls he made to have Michael's things returned.  This email is relevant and discoverable.

Exhibit 16 is a May 12, 2009 email from Schmidt. It discusses how other Scouts on the hike performed (e.g. "he was prepared with plenty of waters, snacks, hat and good

hiking shoes"). It also mentions that another scout may not have realized that Michael died that night. This email is relevant.

Exhibit 18 is a May 13, 2009 email from Schmidt and discusses the possibility of Michael earning the Eagle Scout award after he died. Schmidt explains that he is opposed to this suggestion because Michael is "way short" of meeting the goals and did not earn this award. Plaintiffs contend that Defendants have put forward a theory that Michael's parents decided to file the lawsuit because, in part, they were upset that Michael was not given the Eagle rank after he died on the hike. Given this dynamic, the email is undeniably relevant. Schmidt contends that the email should not be produced because the recipient is a former assistant scoutmaster who has now been declared to be an expert witness. Schmidt cannot immunize discoverable documents by later designating the recipient as an expert witness who will be providing trial testimony.

Exhibits 19 and 20 are e-mails from May 13, 2009 and concern, among other things, the results of efforts to retrieve Michael's belongings. These emails are relevent.

Exhibits 21 through 30 are emails to and from Schmidt and/or other Troop committee representatives, offering opinions on whether Michael should receive the Eagle Scout award after his death. They were written within the first week following Michael's death. These emails are clearly relevant, especially on the issues of potential bias and credibility. *Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) ("[f]acts bearing on the credibility of witnesses are relevant to the claims and defenses raised by the pleadings" and "a party legitimately may seek discovery" of information concerning interest, motive, bias and prejudice); *United States v. Cathcart*, No. 07-4762, 2009 WL 1764642, at *2 (N.D. Cal. June 18, 2009) (noting that the "scope of discovery under the

Federal Rules is extremely broad," explaining that the relevancy question for discovery should be construed "liberally and with common sense" and holding that plaintiff may discover information about the identity and other information concerning the source of payment of defendant's legal fees because it is relevant to the defendant's "credibility and bias" -- even though it "might not bear directly on any disputed fact").

Exhibits 31 and 32 are emails relating to different hikes (i.e., not the one on which Michael died in May 2009).  Exhibit 31 is from Schmidt and is dated April 4, 2009.  It advises Scouts who are hiking next Saturday to bring designated supplies, including a half gallon of water.  Exhibit 32 is also from Schmidt and is also dated April 4, 2009.  It, too, concerns an upcoming hike and advises the Scouts that Schmidt will review with them "what to bring" on the hike at the next meeting.[18]

These two emails are relevant because they tend to show that Schmidt was aware of the need to advise the scouts to bring water and other supplies on a hike.  Schmidt argued that the email has "no relevance" because "Michael did not participate in that hike."  These e-mails are easily within the broad scope of permissible discovery.  They

---

[18]    Schmidt also argues that this email need not be produced because Plaintiffs say that they now have obtained a copy.  But Schmidt has not argued that he knew this when he initially refused to produce the document or when his counsel continued to maintain his position in three telephone conversations before Plaintiffs were forced to file a motion to compel.  "[M]erely because an item may be available from another source is not a proper objection" to discovery.  *Central Transport International, Inc. v. Global Advantage Distribution, Inc.*, No. 06-401, 2007 WL 3124715, at *2 (M.D. Fla. Sept. 11, 2007).

relate to Schmidt's understanding of hike preparations and this is relevant regardless of whether Michael himself personally went on another hike a month before his death.[19]

## V.       CONCLUSION

After all of this litigation, the Court finds that a single email, **Exhibit 1,** is protected by the work product privilege and need not be produced.  The Court also finds that Schmidt did not waive his right to assert the work product privilege for this one email.  Schmidt shall produce to Plaintiffs all of the not-yet-produced emails from the initial group of 32, other than the single privileged email, **within 3 days** of the entry of this Order.

## VI.      MANDATORY ATTORNEY'S FEES

Of course, the mere fact that the Court sustains the work product claim for one of 32 emails hardly means that Schmidt's initial "relevancy" objections were substantially justified.  Emails exchanged among scout leaders within the first few days of Michael's death concerning the circumstances of the hike and preparations for it were incontestably relevant for civil discovery purposes.  The Court reviewed all four allegedly work product emails *in camera* and also observes that it would difficult to imagine a set of documents which would be **more** relevant than these.  Yet by asserting baseless relevancy and privacy objections, Schmidt threw the Plaintiffs off course and did not permit them to meaningfully evaluate his initial objections.  And by refusing to abandon this position when he had the opportunity to do so at successive stages of this discovery

---

[19]     Schmidt's initially argued that "there is no predicate to make this email admissible at the time of trial."  (DE 243).  But trial admissibility is not the standard which governs the scope of discovery.

dispute, Schmidt needlessly produced a second litigation over what should have been a **routine discovery matter** to be handled by counsel without court intervention.

Federal Rule of Civil Procedure 37(a)(5) **requires** courts to impose an award of expenses in connection with a discovery motion unless the court finds one of the limited exceptions applicable.   Moreover, the Rule mandates an expense award (unless an exception applies) *even when a party turns over discovery before being ordered to do so* (so long as the materials were produced *after* the motion to compel is filed).[20]

The Court finds that most of Schmidt's discovery positions -- such as withholding emails encompassed by the broad scope of discovery and asserting a nebulous "confidentiality" and "privacy" theory of privilege -- were not covered by any of the exceptions.   Therefore, Schmidt's counsel made discovery decisions which required Plaintiffs to file a motion to compel and which will now result in an expense award. What's more, the one email that rightly should not have been produced is immune from discovery only because of a work product privilege that Schmidt did not initially assert.

The Court is not required to find (and does not find) that Schmidt's counsel acted in bad faith before awarding fees.   *See Devaney v. Continental American Ins. Co.,* 898 F.2d 1154, 1161-62 (11th Cir. 1993) (noting that the court need not find bad faith to enter an expense award against an attorney and explaining that "when an attorney advises a client in discovery matters, he assumes a responsibility for the professional disposition of that portion of a lawsuit and may be held accountable for positions taken or responses

---

[20]    Rule 37(a)(5) provides that a court "must" require the party or attorney advising the conduct (or both) to pay the movant's reasonable expenses, including attorney's fees, unless (1) the movant filed a motion before conferring, (2) the nondisclosure or objection was "substantially justified" or (3) "other circumstances" make an expense award "unjust."

filed during that process"); *A.F. of L.-A.G.C. Building Trades Pension & Welfare Plans v. W.E. Davis & Sons Construction Co., Inc.,* No. 03-769, 2005 U.S. Dist. LEXIS 42721 (S.D. Ala. Dec. 12, 2005) (holding that Rule 37 expense award is mandatory and explaining that an evidentiary hearing was not required).

Conversely, the Court finds that Plaintiffs, who lost a small portion of the motion to compel concerning the one work product email, were substantially justified in pursuing the motion and that an expense award against them or their counsel for the portion of this Order which denies the motion to compel would be unjust.  Plaintiffs did not know the contents of the work product email and they were initially confronted with relevancy and privilege objections -- not a work product claim -- for emails generated within days of Michael's death. Under these circumstances, filing a motion to compel to challenge the objections was justified and logical.

Schmidt's attorney could have avoided an expense award by following the Boy Scout motto.  He should have been prepared to review his discovery decisions and reconsider them when contacted at least three times by Plaintiffs' counsel.  As events unfolded, however, Schmidt's counsel was not prepared to change his blinkered view of discovery, and his lack of flexibility effectively forced this unnecessary discovery litigation.  Schmidt's counsel could have conceded the discoverability of the documents, rather than adopt such an inflexible attitude.  A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Heder v. City of Two Rivers,* 255 F. Supp. 2d 947, 956 (E.D. Wis. 2003) (quoting *City of*

*Riverside v. Rivera*, 477 U.S. 561, 581 n.11 (1986)).[21]  A "no surrender" mentality may be perfectly appropriate for a Bruce Springsteen rock and roll song,[22] but it is frequently unhelpful in litigation, as illustrated by the unfortunate scenario here.

Because Schmidt and his lead counsel's associate attorney were not responsible for the decision to withhold the emails, the Court concludes that the mandatory expense award will be entered in Plaintiffs' favor only against Schmidt's lead counsel.

The Court is "itself an expert on the question [of determining an hourly rate for attorney's fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value."  *Norman v. Housing Auth.,* 836 F. 2d 1292, 1303 (11th Cir. 1988).   Moreover, the Court prefers to avoid the potentially time-consuming litigation which might be generated on the purely collateral matter of the amount of the expense award under Rule 37.[23]

---

[21]     Former United States Senator Everett Dirksen (1896 -1969) famously announced: "I am a man of fixed and unbending principles, the first of which is to be flexible at all times." http://thinkexist.com/quotes/with/keyword/flexible (last visited Aug. 18, 2011).

[22]     *See* "No Surrender," a well-known song released in 1984 by Bruce Springsteen on his "Born in the U.S.A." album. http:///www.brucespringsteen.net/albums/borninitheusa.html (last visited Aug. 18, 2011). That song contains the following lyrics in the chorus: "Well, we made a promise we swore we'd always remember, no retreat, baby, no surrender." http://www.lyricsdepot.com/bruce-springsteen/no-surrender.html (last visited Aug. 18, 2011).

[23]     This expense award is not premised on a finding of bad faith.  Rather, it is merely the expense-shifting consequence which Rule 37 requires when a motion to compel is granted and the limited exceptions are inapplicable.  Likewise, this expense award is not a disciplinary sanction against counsel.  Instead, as noted, it is only the implementation of the mandatory expense-shifting mechanism of the Rule.  Therefore, counsel would not be required to disclose this award if asked (by, for example, an insurance carrier, a judicial

Therefore, the Court concludes that **$2,000.00** is an appropriate expense award for Plaintiffs' motion to compel, Plaintiffs' counsel's preparation for, and attendance at, the hearing, Plaintiff's counsel's filing of a supplemental memorandum of more than 25 pages, and Plaintiff's counsel's review of Schmidt's voluminous filings. In fact, the Court considers this be an *extremely conservative estimate* of the reasonable attorney's fees in connection with this motion. In calculating the award, the Court took into consideration the fact that Schmidt prevailed on one belatedly asserted work product claim. The Court also concluded that the tardy work product claim for the other three emails falls within an exception to the mandatory expense award provision.

The Court concludes that this amount is reasonable and fair. However, if any party objects to the amount of the award, they may, within 3 days of this Order, file a motion for an evidentiary hearing and simultaneously file as an attachment to the motion the time and billing records spent by all attorneys at his firm in connection with this motion to compel. The Court will timely schedule an evidentiary hearing requested under this procedure.

This award shall be paid solely by Schmidt's lead counsel (not his associate, not his law firm, not his client and not an insurance carrier) and shall be paid within 14 days of this Order.

---

nominations commission, a prospective employer, etc.) whether a court has ever imposed a disciplinary sanction on him.

Schmidt's lead counsel shall submit an affidavit of compliance to the Court's e-file inbox, which is separate and distinct from the public CM/ECF filing system.

DONE AND ORDERED in Chambers, at Miami, Florida, this 19th day of August, 2011.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Hon. Alan S. Gold
Counsel of Record